## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>PGX HOLDINGS, INC. *et al.,*<br><br>                                    Debtors. | Chapter 11<br><br>Case No. 23-10718 (CTG)<br><br>(Jointly Administered)[1] |
| KIRSTEN HANSEN on behalf of herself and all others similarly situated,<br><br>                                    Plaintiff,<br><br>                    v.<br><br>PGX HOLDINGS, INC.; PROGREXION HOLDINGS, INC.; PROGREXION TELESERVICES, INC.; PROGREXION ASG, INC.; PROGREXION IP, INC.; EFOLKS, LLC; CREDITREPAIR.COM, INC.; CREDIT.COM, INC.; and JOHN C. HEATH, ATTORNEY AT LAW PC,<br><br>                                    Defendants. | Adv. Proc. No. 23-50396 (CTG) |

## OPENING BRIEF IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 7007-1(a)(i) of the Local Rules of Bankruptcy Practice and Procedure of

the United States Bankruptcy Court for the District of Delaware,  Defendants PGX Holdings, Inc.;

---

[1]      The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number, are: PGX Holdings, Inc. (2510); Credit Repair UK, Inc. (4798); Credit.com, Inc. (1580); Creditrepair.com Holdings, Inc. (7536); Creditrepair.com, Inc. (7680); eFolks Holdings, Inc. (5213); eFolks, LLC (5256); John C. Health, Attorney At Law PC (8362); Progrexion ASG, Inc. (5153); Progrexion Holdings, Inc. (7123); Progrexion IP, Inc. (5179); Progrexion Marketing, Inc. (5073); and Progrexion Teleservices, Inc. (5110) (collectively, the "Debtors").  The location of the Debtors' service address for purposes of these chapter 11 cases is: 257 East 200 South, Suite 1200, Salt Lake City, Utah 84111.

Progrexion Holdings, Inc.; Progrexion Teleservices, Inc.; Progrexion Marketing, Inc.; Progrexion ASG, Inc.; Progrexion IP, Inc.; eFolks, LLC; Creditrepair.com, Inc.; Credit.Com, Inc. (collectively, the "PGX Defendants"); and John C. Heath, Attorney at Law PC ("Lexington Law", and with the PGX Defendants, "Defendants"), submit the following opening brief in support of their Motion for Summary Judgment. D.I. 16.

### INTRODUCTION

1.       On June 4, 2023, Defendants and other related entities filed independent petitions under chapter 11 of the bankruptcy code. Concurrently, they filed the *Declaration of Chad Wallace in Support of First Day Motions* [D.I. 12] (the "Wallace Dec."), which details the events leading to their filings and is incorporated by this reference.

2.       As relevant here, Defendants are technology and services companies that specialize in credit report repair services and consumer credit education. PGX Defendants monetize the consumer facing brands "CreditRepair.com," and "Credit.com" and separately, support the brand "Lexington Law" primarily by providing Lexington Law with vital non-legal operational support and services under certain operating agreements. In a nutshell, the PGX Defendants provided proprietary software, marketing, administrative, operational, and technical support to Lexington Law in exchange for periodic fees. In the twelve months before the Petition Date (defined below), the PGX Defendants derived approximately 87% of their revenue from services to Lexington Law.

3.       Plaintiff Kirsten Hansen ("Plaintiff") worked for Defendant Progrexion Teleservices, Inc. On June 5, 2023, Plaintiff filed the above-captioned adversary proceeding seeking class certification on behalf of approximately 900 employees whom some of the Defendants laid off on or after April 5, 2023.  Plaintiff alleges these layoffs violated the Worker

Adjustment and Retraining Notification Act, 29 U.S.C. §§ 2101 et seq. (the "WARN Act") because the Defendants did not give the employees at least 60-days advanced notice of their terminations.

4. The undisputed material facts show, however, that Plaintiff's claim fails as a matter of law because Defendants were not required to give 60-days advanced notice of the layoffs under the "faltering company," "unforeseen business circumstances," or "liquidating fiduciary" exceptions to the WARN Act.

## STATEMENT OF UNDISPUTED FACTS

**A.     The CFPB Litigation:**

5. On May 2, 2019, the Bureau of Consumer Financial Protection (the "CFPB") filed a civil action styled *Bureau of Consumer Financial Protection v. Progrexion Marketing, Inc. et. al.*, Case 2:19-CV-00298-BSJ (the "CFPB Litigation") in the United States District Court, District of Utah (the "Utah Court"). Wallace Dec. ¶ 39.

6. The CFPB alleged five counts against Defendants Progrexion Marketing, Inc., PGX Holdings, Inc., Progrexion Teleservices, Inc., eFolks, LLC, CreditRepair.com, and Lexington Law (collectively, the "CFPB Defendants"). *Id.*

7. Count I of the CFPB's amended complaint alleged that commencing March 8, 2016, the CFPB Defendants' billing practices violated the advance fee provision of the Telemarketing Services Rule (the "TSR"), 16 C.F.R. § 310.4(a)(2). Wallace Dec. ¶¶ 9, 39.

8. The CFPB sought approximately $2.7 billion in monetary relief for the CFPB Defendants' alleged violation of the TSR. Wallace Dec. ¶ 41.

9. Over the next four years, the CFPB Defendants heavily contested the CFPB's interpretation of the TSR and its authority to enforce it. *See e.g.*, Wallace Dec. ¶¶ 40-41.

10.     For example, following extensive discovery, on August 20, 2021, Lexington Law moved for summary judgment on Count I of the CFPB's amended complaint, challenging the CFPB's reading of the TSR for at least five reasons, including constitutional deficiencies. *See* CFPB Litigation D.I. 171.[2]

11.     On January 20, 2022, the Utah Court denied Lexington Law's motion "without prejudice." *See* CFPB Litigation D.I. 287.

12.     On January 21, 2022, CFPB Defendants Progrexion Marketing, Inc., PGX Holdings, Inc., Progrexion Teleservices, Inc., eFolks, LLC, and CreditRepair.com, Inc. moved for summary judgment challenging the CFPB's interpretation of the TSR.  *See* CFPB Litigation D.I. 288.

13.     On May 16, 2022, the Utah Court denied that motion for summary judgment "without prejudice." *See* CFPB Litigation D.I. 403.

14.     On December 10, 2021, the CFPB moved for partial summary judgment on Count I of its amended complaint against all CFPB Defendants. *See* CFPB Litigation D.I. 257.

15.     The parties filed multiple briefs in support and opposition to the CFPB's motion for summary judgment, and the Utah Court held multiple hearings on that motion. *See e.g.,* CFPB Litigation D.I. 257, 277, 283, 301, 306, 341, 358, 470, 475, 478, 480.

16.     Notably, the CFPB Defendants challenged again the CFPB's interpretation of the TSR, urging the Utah Court to adopt the United States Court of Appeals for the Fifth Circuit's

---

[2]     The Court may take judicial notice of "a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questions." Fed. R. Evid. 201(b)(2), made applicable by Fed. R. Bankr. P. 9017. Such notice may be taken "at any stage of the proceeding." *Id.* at 201(d).

decision in a parallel case, *Community Financial Services Ass'n of America v. CFPB*, 51 F.4th 616 (5th Cir. Oct. 19, 2022). *See* CFPB Litigation D.I. 496.

17.     In that case, the Fifth Circuit held that "Congress's cession of its power of the purse to the [CFPB] violates the Appropriations Clause and the Constitution's underlying structural separation of powers." *Community Financial,* 51 F. 4th at 644.

18.     The CFPB Defendants pointed to the CFPB's petition for writ of *certiorari* to the Supreme Court of the United States, where the CFPB argued that the Fifth Circuit's decision could impact its case against the CFPB Defendants because the opinion "calls into question virtually every action [the CFPB] has taken in the 12 years since it was created." *See* CFPB Litigation D.I. 496 at 1 (quoting the CFPB's petition for a writ of certiorari).

19.     On February 27, 2023, the Supreme Court granted the CFPB's petition for a writ of *certiorari* but delayed oral arguments on the CFPB's constitutionality until October 2, 2023. *See* U.S. D.I. 22-448 (Jul. 14, 2023).

20.      Against this backdrop, on Friday, March 10, 2023, the Utah Court entered an order granting partial summary judgment in favor of the CFPB on Count I of its amended complaint (the "March 10 Order"). *See* CFPB Litigation D.I. 508.

21.     The Utah Court concluded that the CFPB Defendants' business practices violated the TSR, but "the court ma[de] no determination regarding damages."  *See* March 10 Order at 13.

22.     The next business day, on Monday, March 13, 2023, the CFPB Defendants moved to stay the March 10 Order pending interlocutory review by the United States Court of Appeals for the Tenth Circuit. *See* CFPB Litigation D.I. 509-513.

23.     On March 15, 2023, the Tenth Circuit entered an order temporarily staying the March 10 Order pending interlocutory review. *See* CFPB Litigation D.I. 515.

24.     Over the next three weeks, the CFPB and CFPB Defendants briefed motions seeking a stay and review of the March 10 Order. *See* CFPB Litigation D.I. 509-536.

25.     For example, on March 23, 2023, the CFPB Defendants moved to expedite the hearing on their motion to stay the March 10 Order, arguing that "compliance with the March 10 Order will put [the CFPB Defendants] out of business in short order" partly because the CFPB Defendants "would have to cease monthly billing for the over 80% of credit repair clients who signed up for services over the phone for at least six months – causing [the CFPB Defendants] to run out of cash within a few weeks." *See* CFPB Litigation D.I. 519.

26.     On April 4, 2023, the Tenth Circuit lifted the temporary stay and denied interlocutory review of the March 10 Order. *See* CFPB Litigation D.I. 537.

27.     On April 6, 2023, the Utah Court denied the CFPB Defendants' motion to stay the March 10 Order. *See* CFPB Litigation D.I. 539.

28.     On June 7, 2023, the Utah Court also denied the CFPB's motion for "Award of Monetary and Injunctive Relief, Assessment of Civil Money Penalties, and Entry of Final Judgment Against all Defendants on Count I."  *See* CFPB Litigation D.I. 574. The Utah Court concluded "it became apparent that outstanding issues of fact preclude the Court from entering Plaintiff's requested relief at this time." *Id.* at 3.

29.     Two months earlier, the CFPB Defendants had been forced to stop all marketing, close call centers, and institute a review of billing practices across their businesses to comply with the CFPB's interpretation of the TSR and to avoid financial catastrophe. *See* Wallace Dec. ¶ 29.

[continues on following page]

**B.**   **Defendants' Relevant Financial History:**

30.     In 2021, the PGX Defendants generated approximately $457 million in gross revenue. *See* Supplemental Declaration of Chad Wallace in Support of this Motion (the "Wallace Sup. Dec."), filed concurrently, at ¶ 5.

31.     In 2022, the PGX Defendants generated approximately $335 million in gross revenue, which included $251.6 million paid by Lexington Law for the services described above. *See* Wallace Dec. ¶¶ 20, 27.

32.     In the first quarter of 2023, the PGX Defendants generated approximately $64 million in gross revenue. Wallace Sup. Dec. ¶ 7.

33.     The PGX Defendants supplemented their revenue through two primary credit facilities that they refinanced in July 2021 due to COVID-related headwinds. *See* Wallace Dec. ¶¶ 30-34.

34.     Specifically, on July 21, 2021, the PGX Defendants and some of their affiliates entered into the First Lien Financing Agreement (the "First Lien Facility") with certain lenders and Blue Torch Finance LLC as administrative and collateral agent.  *See* Wallace Dec. ¶ 31.

35.     On July 21, 2021, the PGX Defendants and some of their affiliates entered into a second-lien term loan credit facility (the "Second Lien Facility") with certain creditors and Prospect Capital Corporation as administrative agent for the creditors. Wallace Dec. ¶ 33.

36.     The First Lien Facility and Second Lien Facility (the "Prepetition Facilities") refinanced pre-existing debt and included additional liquidity tests in the event of a judgment or resolution of the CFPB Litigation. Wallace Dec. ¶ 48.

37.     Between July 2021 and the fall of 2022, the PGX Defendants continued to face financial headwinds, and in September 2022, they engaged a financial advisor and restructuring

counsel to explore a possible recapitalization or restructuring of the Prepetition Facilities. Wallace Dec. ¶ 50.

38.    Those negotiations culminated on December 28, 2022, when the prior majority owner of PGX Holdings, Inc. agreed to transfer equity to Prospect, and in exchange, the creditors agreed to advance $40 million in new funds under the Prepetition Facilities (the "December 2022 Facility"). Wallace Dec. ¶¶ 50-51.

39.    The December 2022 Facility consisted of $15 million that the lenders advanced on December 28, 2022, and an additional $30 million that were to be disbursed throughout the Spring of 2023. Wallace Dec. ¶ 51.

40.    On March 17, 2023, the PGX Defendants requested to draw the $30 million balance of the December 2022 Facility to supplement their revenue so they could cover operating expenses, including payroll, and make a $7.7 million interest payment that was due March 31, 2023, on the Prepetition Facilities. *See* Wallace Dec. ¶ 53; *see also*, Wallace Sup. Dec. ¶ 10.

41.    The $30 million in additional funding available under the December 2022 Facility would have also allowed the PGX Defendants to continue business operations for several months. Wallace Sup. Dec. ¶ 11.

42.    On March 24, 2023, Prospect did not fund the PGX Defendants' request, stating that the borrowers had not satisfied all conditions under the Prepetition Facilities. Wallace Sup. Dec. ¶ 12.

43.    A copy of Prospect's rejection of the $30 million draw is attached as Exhibit 1 to Wallace's Supplemental Declaration. *See* Wallace Sup. Dec. ¶ 13.

44.    On March 29, 2023, the PGX Defendants replied demanding that Prospect fund the $30 million draw because they had not defaulted under the Second Lien Facility and failure to

receive those funds would cause the PGX Defendants to shut down operations. *See* Wallace Sup. Dec. ¶ 14.

45.     A copy of the PGX Defendants' reply to Prospect is attached as <u>Exhibit 2</u> to the Wallace Supplemental Declaration. *See* Wallace Sup. Dec. ¶ 15.

46.     On Friday, March 31, 2023, the lenders did not fund the $30 million draw under the December 2022 Facility. Wallace Dec. ¶¶ 54-55.

47.     Instead, the PGX credit parties negotiated a short forbearance agreement with the prepetition lenders and skipped the $7.7 million interest payment that was due on March 31, 2023. *See* Wallace Sup. Dec. ¶ 17. The parties entered into successive forbearance agreements with respect to the Prepetition Facilities effective through June 4, 2023 (collectively, the "<u>Forbearance Agreements</u>"). *Id.* With the Forbearance Agreements in place, the parties focused on a more comprehensive restructuring transaction to be effectuated through a chapter 11 process. Wallace Dec. ¶¶ 54-55.

**C.     <u>Layoffs and Bankruptcy Filing</u>:**

48.     Throughout the CFPB Litigation, the Defendants worked on alternative business models that would address the CFPB's concerns. Wallace Sup. Dec. ¶ 18.

49.     Those efforts continued until April 4, 2023, when the Tenth Circuit denied the motion to for interlocutory appeal and lifted its stay of the March 10 Order. Wallace Sup. Dec. ¶ 19.

50.     By then, the PGX Defendants had determined they would run out of liquidity in mid-May 2023, and that a sale of substantially all of their assets, followed by a controlled liquidation through chapter 11 would yield the highest return for creditors. Wallace Sup. Dec. ¶ 20.

51.     Between April 5 and 6, 2023, some of the Defendants shut down nearly 80% of their operations while conducting the first round of employee layoffs as follows (the "<u>First Layoffs</u>"):

      a.     Progrexion Teleservices, Inc. laid off a total of 800 employees at 8 facilities located throughout 7 states;

      b.     Progrexion ASG, Inc., laid off 77 employees at 7 facilities located throughout 6 states; and,

      c.     Progrexion Marketing, Inc. laid off 14 employees who worked out of its Salt Lake City, Utah facility.

Wallace Sup. Dec. ¶¶ 21(a)-(c).

52.     Examples of the termination notices sent to employees by Progrexion Teleservices, Inc., Progrexion ASG, Inc., and Progrexion Marketing, Inc. during the First Layoffs are attached as <u>Exhibit 3</u> to Wallace's Supplemental Declaration. *See* Wallace Sup. Dec. ¶ 22.

53.     Meanwhile, between April and May 2023, with the Forbearance Agreements in place, the Defendants and their advisors prepared for a chapter 11 filing. *See* Wallace Sup. Dec. ¶¶ 24. While developing a framework with the existing lenders that contemplated a section 363 sale, followed by a liquidating chapter 11 plan, the Debtors' investment banker aggressively marketed a 6-month debtor-in-possession financing to at least 30 potential DIP lenders. *See id.* Despite the robust marketing process, no alternative DIP proposals emerged. *See id.*

54.     Concurrently, Lexington Law began mothballing operations in advance of the chapter 11 process given that the PGX Defendants could no longer support Lexington Law's practice. Wallace Sup. Dec. ¶ 25.

55.     To that end, on May 11, 2023, Lexington Law laid off 123 employees who worked in Arizona and Utah; Progrexion ASG, Inc. laid off an additional 13 employees at two locations; and CreditRepair.com, Inc. laid off 15 employees at its facilities in Salt Lake City, Utah (the "Second Layoffs"). Wallace Sup. Dec. ¶ 26.

56.     Examples of the termination notices sent to employees by Lexington Law and Progrexion ASG, Inc. as part of the Second Layoffs are attached as Exhibit 4 to Wallace's Supplemental Declaration. *See* Wallace Sup. Dec. ¶ 27.

57.     To ensure a soft landing in chapter 11 and finalize certain documentation, on May 31, 2023, the First Lien Facility lenders agreed to fund a $2.9 million emergency facility ahead of the filing to help the Defendants ease into chapter 11. Wallace Sup. Dec. ¶ 29.

58.     On June 4, 2023 (the "Petition Date"), Defendants filed voluntary petitions under chapter 11 of the Bankruptcy Code. D.I. 1.

59.     As part of its first day motions, Debtors sought joint administration of their chapter 11 cases, which the Court subsequently granted. *See* D.I. 3, 55.

60.     On June 5, 2023, Debtors filed a motion seeking authority to obtain post-petition financing, utilize cash collateral, and grant certain super-priority liens and super-priority administrative expense status to the DIP lenders. D.I. 17.

61.     Among other things, Debtors sought permission to borrow up to $19.9 million with a 105-day maturity.  In exchange for this new-money financing, the Debtors agreed to run a post-petition marketing process for substantially all of their assets and absent any higher or better offers, the DIP lenders agreed to purchase the PGX assets and "support a liquidating plan" and to include "a wind-down budget in the amount of no less than $2.625 million to support implementation of

that plan." D.I. 17 ¶ 2. Separately, the equity holders of Lexington Law agreed to be the stalking horse bidder for the Lexington Law assets.

62.    On June 6, 2023, the Court entered an order granting Defendants' motion for authority to obtain post-petition financing on an interim basis (the "Interim DIP Financing Order"). D.I. 70.

63.    Under the Interim DIP Financing Order, the Court authorized Defendants to borrow up to $12 million in new-money commitments, with the remaining amount subject to a final order. *See* D.I. 70-1 at ¶ 6.01(s). The Court also approved adequate protection for pre-petition secured creditors and DIP lenders, including the Defendants' covenant to meet certain milestones leading to Defendants' disposition of all their assets at a section 363 auction within 65 days after the Petition Date. *See* D.I. 70 ¶ 11.

64.    On June 6, 2023, Defendants Lexington Law laid off 13 employees who worked at two facilities in Arizona and Utah; Progrexion ASG, Inc. laid off 17 employees at three facilities in Utah, Texas, and Arizona; and Progrexion Marketing, Inc. laid off 3 employees at its facilities in Salt Lake City, Utah (the "Third Layoffs"). Wallace Sup. Dec. ¶ 30.

65.    Examples of the termination notices sent to employees by Lexington Law, Progrexion ASG, Inc., and Progrexion Marketing, Inc. during the Third Layoffs are attached as Exhibit 5 to Wallace's Supplemental Declaration. *See* Wallace Sup. Dec. ¶ 31.

**D.    Plaintiff's Claims**:

66.    Plaintiff was laid off by Progrexion Teleservices, Inc. during the First Layoffs on April 5, 2023. Wallace Sup. Dec. ¶ 23.

67.     On May 24, 2023, Plaintiff filed a complaint in the U.S. District Court for the District of Utah against all Defendants alleging the layoffs violated the WARN Act. Wallace Sup. Dec. ¶ 28.

68.     On June 5, 2023 – one day after the Petition Date – Plaintiff initiated this adversary proceeding by filing an identical complaint in this Court. *See* Adv. D.I. 1.

69.     In this proceeding, Plaintiff seeks priority under 11 U.S.C. §§ 507(a)(4) and (a)(5) for up to $15,150 for each of the employees who were laid off by any of the Defendants within 90 days of April 5, 2023, arguing those layoffs violated the WARN Act. Adv. D.I. 1 at 13-14.

## GOVERNING STANDARD

70.     Defendants seek summary judgment that Plaintiff's claim fails as a matter of law under any or all of three commonly recognized exceptions to WARN Act liability.

71.     Pursuant to Federal Rule of Civil Procedure 56(c), made applicable by Federal Rule of Bankruptcy Procedure 7056, summary judgment is appropriate when there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). To withstand summary judgment, the opposing party must introduce sufficient admissible evidence, as to every single element of her case, that would convince a reasonable finder of fact that judgment could be rendered in her favor. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S. Ct. 2548, 2553 (1986). "[T]he opposing party must do more than simply show that there is some metaphysical doubt as to the material facts." *Wells Fargo Bank, N.A. v. HomeBanc Corp.* (*In re Homebanc Mortg. Corp.*), Nos. 07-11079 (KJC), 07-51740 (KJC), 2012 Bankr. LEXIS 6021, at *1 (Bankr. D. Del. Jan. 18, 2012). "Summary judgment cannot be avoided by introducing only a mere scintilla of evidence or by relying on conclusory allegations, improbable inferences and unsupported speculation." *Id.*

72.     Put differently, "while the facts must be viewed in the light most favorable to the nonmoving party and all inferences must be drawn in that party's favor . . . there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. . .." *Gray v. York Newspapers, Inc.,* 957 F.2d 1070, 1078 (3d Cir. 1992). "If the evidence is merely colorable, . . . or is not significantly probative, . . . summary judgment may be granted." *Id.*

## ARGUMENT

**I.     PLAINTIFF'S CLAIM FAILS BECAUSE DEFENDANTS WERE EXCUSED FROM PROVIDING 60-DAYS ADVANCED NOTICE OF THE LAYOFFS UNDER AT LEAST ONE OF THREE WARN ACT EXCEPTIONS.**

73.     The WARN Act requires "employers who are planning a plant closing or a mass layoff to give affected employees at least 60 days' notice of such an employment action." 20 CFR § 639.2; *see also,* 29 U.S.C. §§ 2101 et seq. But the WARN Act requires only "as much notice as is practicable" – and in some cases, no pre-termination notice at all – where the layoffs are (A) conducted by a "faltering company," (B) caused by "unforeseen business circumstances," or (C) ordered by a "liquidating fiduciary." *See* 20 CFR § 639.9; *In re United Healthcare Sys.*, 200 F.3d 170, 177 (3d Cir. 1999).  At least one of these exceptions applies to each of the three rounds of layoffs at issue in this proceeding.

**A.     Defendants Were Not Required to Provide 60-Days Advanced Notice of the Three Rounds of Layoffs under the "Faltering Company" Exception.**

74.     An employer qualifies for the "faltering company" exception when:

(1) it was actively seeking capital at the time the 60-day notice would have been required, (2) it had a realistic opportunity to obtain the financing sought, (3) the financing would have been sufficient, if obtained, to enable the employer to avoid or postpone the shutdown, and (4) the employer reasonably and in good faith believed that sending the 60-day notice would have precluded it from obtaining the financing.

*AE Liquidation, Inc. v. Eclipse Aviation Corp.* (*In re Varela*), 522 B.R. 62, 67 (Bankr. D. Del. 2014); *see also*, *In re APA Transp. Corp. Consol. Litig.*, 541 F.3d 233, 248 (3d Cir. 2008).

75.     Here, Defendants' three rounds of layoffs satisfy all four elements of the "faltering company" exception.

**1.      Defendants were actively seeking capital at the time the notice would have been required for all three rounds of layoffs.**

76.     An employer is "actively seeking capital" within the meaning of the WARN Act when it is "seeking financing or refinancing through the arrangement of loans, the issuance of stocks, bonds, or other methods of internally generated financing" or "seeking additional money, credit, or business through any other commercially reasonable method." 20 CFR § 639.9(a)(1). "The employer must be able to identify specific actions taken to obtain capital or business." *Id.* Here, Defendants were actively seeking capital more than 60-days before each of the three rounds of layoffs.

77.     First, the PGX Defendants were actively seeking capital at least 60 days before the First Layoffs of April 5 and 6, 2023 – *i.e.*, on and after February 4, 2023. Between December 28 and through March 31, 2023, the PGX Defendants were seeking to draw up to $30 million in additional funding that the First and Second Lien lenders committed to fund, subject to certain conditions precedent, as a delayed-draw term loan under the December 2022 Facility. *See* Wallace Dec. ¶ 51.

78.     Second, Defendants were actively seeking capital at least sixty days before the Second Layoffs of May 11, 2023 – *i.e.*, on or after March 12, 2023. On March 17, 2023, the PGX Defendants requested to draw the $30 million balance of the December 2022 Facility. *See* Wallace Dec. ¶ 53; *see also*, Wallace Sup. Dec. ¶¶ 10-17, 24. Even after the lenders refused to fund that request on March 31, 2023, the Defendants engaged in comprehensive restructuring discussions with the lenders and launched an aggressive search for DIP financing from alternative capital sources. *See* Wallace Sup. Dec. ¶ 24.  Those efforts continued past the Second Layoffs, and had

they been completely successful, Defendants would have been able to warn the employees at least during the 36-days gap between April 5 and May 11, 2023. *See* Wallace Sup. Dec. ¶¶ 24, 29.

79.     Third, Defendants were actively seeking capital in at least sixty days before the Third Layoffs of June 6, 2023 – *i.e.,* on or after April 7, 2023. Again, Defendants sought DIP financing from April 4, 2023, through the eve of the Petition Date.

80.     In sum, Defendants meet the first element of the "faltering company" exception as to all three rounds of layoffs because they were "actively seeking additional money [and] credit" throughout the sixty days preceding each round.

**2.      Defendants had a realistic opportunity to obtain the financing they sought.**

81.     Defendants meet the second element of the "faltering company" exception because they had a realistic opportunity to obtain the financing they sought during the 60-days before each round of layoffs. 20 CFR § 639.9(a)(2).

82.     The PGX Defendant successfully negotiated the December 2022 Facility, performed their obligation to transfer equity to Prospect pursuant to the terms of that deal, and obtained the first disbursement under the December 2022 Facility in the amount of $15 million. They also met the conditions to draw the balance of that facility in the amount of $30 million in the spring of 2023, even though the lenders declined to go through with that funding. *See* Wallace Sup. Dec. ¶ 15 Ex. 2. Notably, the stated reason for their refusal – *i.e.*, that the March 10 Order would likely prevent the borrowers from obtaining certified financials – did not arise until when the Utah Court entered the order on March 10, 2023. *See id.* ¶ 13 Ex. 1. And the lenders did not notify PGX Defendants that the funding was in jeopardy until March 24, 2023. *See id.* Between then and March 31, the PGX Defendants engaged in significant good faith negotiations to change the lenders' minds. Thus, Defendants meet the second element of the "faltering company"

exception because through March 31, 2023, they had a realistic opportunity of getting up to $30 million in additional financing under the December 2022 Facility.

83.    Defendants also had an opportunity of securing DIP financing from an alternate source through the comprehensive campaign they mounted in April and May 2023. Defendants retained an experienced investment bank whose professionals reached out to at least 30 potential lenders. And while those opportunities did not materialize, ultimately, the Defendants obtained a $2.9 million bridge loan from the existing lenders that allowed them to preserve the value of their assets for the benefit of all creditors while they prepared to file chapter 11.

84.    In short, Defendants meet the second element of the "faltering company" exception because they had a realistic opportunity of obtaining additional financing during the 60-days preceding all three rounds of layoffs in the form of both further advances under the December 2022 Facility or DIP financing in anticipation of their bankruptcy filings.

**3.    If obtained, the financing would have been sufficient to enable Defendants to avoid or postpone the shutdown.**

85.    Defendants meet the third element of the "faltering company" exception because they have "objectively demonstrate[d] that the amount of capital or the volume of new business sought would have enabled the employer to keep the facility, operating unit, or site open for a reasonable period of time."  20 CFR § 639.9(a)(3).

86.    The $30 million in additional funding available under the December 2022 Facility, combined with their operating revenue, would have allowed the PGX Defendants to continue business operations for several months. And the PGX Defendants were working on an alternative business model right until they were forced to conduct the First Layoffs. Borrowing from the C.F.R., "the volume of new business" that Defendants sought "would have enabled [them] to keep" operations going for a reasonable period because they were on track to generate

$64 million in revenue during the first quarter of 2023. *See* 20 CFR § 639.9(a)(3); *see also*, Wallace Sup. Dec. ¶ 7. Similarly, the $30 million to $50 million Defendants sought in DIP financing in April and May of 2023 would have allowed them to continue operations to preserve the value of their businesses as going concerns. Wallace Sup. Dec. ¶ 11. While Defendants had concluded by then that an orderly liquidation was optimal, the DIP financing would have allowed the PGX Defendants to continue supporting Lexington Law long enough for it to give sufficient notice of the Second Layoffs. In short, the Defendants meet the third element of the "faltering company" exception because the funding they sought under the December 2022 Facility and DIP proposals would have allowed them to continue operations for 60 days or more.

### 4.    Defendants reasonably and in good-faith believed that sending the 60-day notice would have precluded them from obtaining financing.

87.    The fourth factor of the "faltering business" exception to the WARN Act requires a showing that Defendants "reasonably thought that a potential customer or source of financing would have been unwilling to provide the new business or capital if notice were given, that is, if the employees, customers, or the public were aware that the facility, operating unit, or site might have to close." 20 CFR § 639.9(a)(4). Defendants meet this element too.

88.    One of the conditions of the December 2022 Facility was that the PGX Defendants would continue operating their business, as the lenders were not <u>then</u> interested in financing a liquidating entity. *See* Wallace Dec. ¶ 9. As discussed below, as of February 2023, the PGX Defendants did not expect the Utah Court to rule in favor of the CFPB, let alone to refuse to stay such an order pending appeal. That was all unforeseeable.  But even if a negative outcome in the CFPB Litigation had been foreseeable, the PGX Defendants reasonably expected that the creditors would declare a default under the December 2022 Facility if potential layoffs had been announced at any time prior to the March 31, 2023 funding deadline under the December 2022 Facility.

Similarly, announcing the Second and Third Layoffs would have repelled potential DIP lenders who would have questioned the Defendants ability to preserve the value of their assets without a significant staff.

89.     In sum, Defendants were not required to give 60-days advanced notice of the layoffs because under the "faltering company" exception, they were actively seeking financing during that period, had a reasonable expectation of receiving sufficient financing in the form of both additional draws under the December 2022 Facility and the proposed DIP financing structure, and creditors would have walked away had they learned that Defendants would need to shut down nearly 80% of their operations.

**B.     Alternatively, Debtors Meet the "Unforeseen Business Circumstances" Exception to WARN Act Liability as to the First and Second Layoffs.**

90.     Under the "unforeseen business circumstances" exception, an employer is not required to provide 60-days' advance notice of layoffs where "1) the claimed circumstance was unforeseeable, and 2) the layoffs were caused by that circumstance." *AE Liquidation*, 522 B.R. at 68 (internal quotations omitted). "[T]he regulations do not suggest that this exception should be narrowly construed" and instead, the Court must simply ask whether a "similarly situated employer in the exercise of commercially reasonable business judgment would have foreseen the closing." *Id.* at 68 (internal citation omitted).

91.     "[A]n important indication of such circumstances is a sudden, dramatic, and unexpected action or condition outside of the employer's control." *AE Liquidation*, 522 B.R. at 68; 20 C.F.R. § 639.9(b)(1). Moreover, courts "must bear in mind that it is the probability of occurrence that makes a business circumstance reasonably foreseeable, rather than the mere possibility of such a circumstance." *AE Liquidation*, 522 B.R. at 69 (internal quotations omitted).

92.     For example, in *AE Liquidation*, the court held that the failure to close on the sale of the defendant's business was not reasonably foreseeable 60 days before corresponding layoffs because funding had already been secured for the sale and the company's majority stakeholder had already committed to finance $20 million of the purchase price. The *AE Liquidation* court found it was not probable the sale would fail, especially considering the continual assurances it would close.

93.     Here, the circumstances triggering Defendants' layoffs were not "reasonably foreseeable" 60 days ahead. On the one hand, the procedural history of the CFPB Litigation did not suggest that the Utah Court would likely rule in favor of the CFPB, let alone refuse to stay an order in the CFPB's favor. For example, although the Utah Court had denied the CFPB Defendant's motions challenging the CFPB's interpretation of the TSR, the denials were "without prejudice," suggesting that the Utah Court did not believe denial was warranted as a matter of law. And during the four years that the parties litigated over the TSR, the Fifth Circuit determined that the CFPB's structure was unconstitutional. Under such circumstances, it was not likely let alone "probable" that the Utah Court would side with the CFPB or refuse to stay the March 10 Order pending appeal, or at a minimum, pending the Supreme Court's review of the Fifth Circuit's decision and the CFPB's constitutionality.

94.     On the other hand, in the 60-days preceding the First Layoffs, it was not probable either that the creditors would refuse to disburse the balance of the December 2022 Facility. Again, as of February 2023, the Utah Court had not even suggested it would rule in favor of the CFPB on Count I of the CFPB's complaint. But even after the Utah Court entered the March 10 Order, it was not probable that the creditors would pull their funding. Like the majority stakeholder in *AE Liquidation,* Prospect committed to fund the full $45 million December 2022 Facility and it

honored the initial $15 million draw just three months before refusing the disburse the balance. And the lenders were intimately familiar with the Debtors operations, the status of the CFPB Litigation, and the risks of an adverse ruling on Count I of the CFPB's complaint. Given that familiarity, it was not objectively foreseeable to the Debtors that the lenders would walk away because of an adverse ruling on Count I of the complaint – or at least, not until an appeal of that ruling were exhausted. In short, the creditors' refusal to fund the balance of the December 2022 Facility was unforeseeable and thus Defendants were not required to give 60-days warning before the first round of layoffs in April 2023.

95.    Moreover, both the substance and timing of the layoff notices complied with the WARN Act's requirements under the circumstances. Where, as here, the "unforeseen business circumstances" exception applies, the WARN Act still requires termination notices informing "employees whether the planned action will be permanent or temporary, the expected date when the layoff will begin, when the individual employees will be separated, whether bumping rights exist, and the name and telephone number of a company official who can be contacted for further information." *AE Liquidation*, 522 B.R. at 70. The notices provided here include all this information. *See e.g.*, Wallace Sup. Dec., Exs. 3-5. Defendants also gave those notices as soon as it was practical under the circumstances. For example, Defendants notified nearly 90% of the employees who were laid off within three business days after the creditors refused to fund the March 31, 2023, draw and one business day after the Tenth Circuit lifted its stay of the March 10 Order.

96.    In sum, Defendants were excused from providing 60-days advanced notice under the "unforeseen business circumstances" liberal exception to the WARN Act.

**C.    Defendants Were Operating as "Liquidating Fiduciaries" Rather Than "Employers" Within the Meaning of the WARN Act.**

97.    Defendants were excused from the 60-days advance warning requirement as to the Second and Third Layoffs for another alternative reason: after April 5, 2023, they effectively became "liquidating fiduciaries" rather than "employers" subject to the WARN Act. *See In re United Healthcare Sys*., 200 F.3d 170, 177 (3d Cir. 1999) (internal quotations omitted). In a nutshell, companies are not required to provide 60-days' notice where they are merely engaged in the liquidation of assets at the time of the mass layoff. *See Id.* "The more closely the entity's activities resemble those of a business operating as a going concern, the more likely it is that the entity is an 'employer;' the more closely the activities resemble those of a business winding up its affairs, the more likely it is the entity is not subject to the WARN Act." *Id.* (internal citation omitted).

98.    Here, after the First Layoffs on April 5 and 6, 2023, a significant portion of the Defendants' operations more closely resembled those of a business winding down its affairs than those of the credit repair company it once was. By April 6, 2023, the Defendants had shut down nearly 80% of their collective operations, laid off 90% of their collective employees, and closed the call centers at the heart of their business model. The few employees who remained around were focused on preserving the value of the Debtors' assets in anticipation of a chapter 11 sale and liquidation. These included the 123 employees that Lexington Law ultimately laid off in May 2023. After April 6, 2023, Lexington Law lost its source of new customers and was simply focused on preparing existing customer accounts for a potential sale in bankruptcy.

99.    In sum, Defendants were not required to give 60-days advanced notice of the Second and Third Layoffs because they were liquidating fiduciaries and not "employers" under WARN Act after April 5, 2023.

## CONCLUSION

100.    For the foregoing reasons, summary judgment is warranted against Plaintiff and in

favor of Defendants on Plaintiff's claim in this adversary proceeding.

Dated:  September 22, 2023
Wilmington, Delaware

/s/ *Domenic E. Pacitti*
**KLEHR HARRISON HARVEY**
**BRANZBURG LLP**
Domenic E. Pacitti (DE Bar No. 3989)
Michael W. Yurkewicz (DE Bar No. 4165)
919 North Market Street, Suite 1000
Wilmington, Delaware 19801
Telephone:        (302) 426-1189
Facsimile:         (302) 426-9193
Email:    dpacitti@klehr.com
              myurkewicz@klehr.com

    -and-

Morton R. Branzburg (*pro hac vice* pending)
1835 Market Street, Suite 1400
Philadelphia, Pennsylvania 19103
Telephone:        (215) 569-3007
Facsimile:         (215) 568-6603
Email:  mbranzburg@klehr.com

*Co-Counsel to the Debtors and Debtors in*
*Possession*

**HOLLAND & HART LLP**
Bryan Benard (*pro hac vice* forthcoming)
Engels J. Tejeda (*pro hac vice* forthcoming)
222 South Main Street, Suite 1200
Salt Lake City, Utah 84105
Telephone:        (801) 799-5800
Facsimile:         (877) 665-1699
Emails:  bbenard@hollandhart.com
              ejtejeda@hollandhart.com

*Special Employment Counsel to the Debtors and Debtors*
*in Possession*

30471367_v2